IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 8, 2011 Session

**ALYSON LEIGH AMONETTE EBERTING v. JEFFREY JENNINGS EBERTING**

**Appeal from the Chancery Court for Knox County**
**No. 171599-1      John F. Weaver, Chancellor**

**No. E2010-02471-COA-R3-CV - Filed February 27, 2012**

After fourteen years of marriage, Alyson Leigh Amonette Eberting ("Wife") sued Jeffrey Jennings Eberting ("Husband") for divorce. After a trial, the Trial Court entered its Final Judgment for Divorce on August 12, 2010, which, *inter alia*, awarded Wife a divorce, distributed the marital property, entered a Permanent Parenting Plan, awarded Wife transitional alimony, and awarded Wife attorney's fees as alimony in solido. Husband appeals raising issues regarding the valuation of his orthodontic practice, the parenting plan, and the award of Wife's attorney's fees. Wife raises issues concerning the overall property division, and the amount of attorney fees and expenses awarded to Wife as alimony in solido. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and JOHN W. MCCLARTY, J., joined.

Jerrold L. Becker, Knoxville, Tennessee, for the appellant, Jeffrey Jennings Eberting.

Alyson Amonette Eberting, Esq., Knoxville, Tennessee, pro se appellee.

## OPINION

## Background

Husband and Wife were married in July of 1993. Wife sued Husband for divorce in February of 2008. The case was tried over multiple days in January and September of 2009, and February of 2010.

At the time of the marriage, Husband was in dental school and Wife was just beginning law school. Both parties served in the Navy during the marriage. After completing his Navy service, Husband began orthodontic school in 1999.

The parties' first child was born in October of 1999. At that time, Husband was in orthodontic school and Wife was in the Navy. Wife was the primary care-giver for the parties' child. The parties' second child was born in September of 2001, days before Wife completed her Navy service and Husband graduated from orthodontic school. The parties moved to Knoxville less than one week after the birth of their second child. Wife stayed home with the Children and was the primary care-giver from the time the parties moved to Knoxville until December of 2002. In December of 2002 Wife began work as an assistant city attorney in the City of Knoxville Law Department. The parties' third child was born in April of 2003.[1]

The parties purchased a house when they moved to Knoxville. In 2005, the parties purchased real property on which they planned to build their dream house. Building never started on their dream house because the parties were paying off the loan for Husband's new orthodontic practice.

When the parties moved to Knoxville, Husband purchased the existing orthodontic practice of Dr. Thomas Pryse for $250,000. The purchase of Dr. Pryse's practice included equipment, patient accounts, staff, and goodwill. The purchase did not include accounts receivable. Dr. Pryse's practice encompassed two locations, one in Knoxville and one in Maryville. Initially, Dr. Pryse was to continue working with Husband for the first year after the sale. Dr. Pryse, however, required hip replacement surgery in March of 2002 and complications arose resulting in Husband's taking over the practice sooner than anticipated. Approximately five months after he purchased Dr. Pryse's practice, Husband negotiated to buy another practice from Rupert Knierim for $400,000. These negotiations included equipment, patient charts, and goodwill. Ultimately, Husband did not purchase Dr. Knierim's practice.

---

[1] At times in this Opinion we refer to the parties' three children collectively as "the Children."

In the fall of 2004, Husband began building a new office building for his practice in Maryville. The property upon which the new building sits, 619 Smithview, is owned by Tooth Enterprises, LLC an entity formed to own the 619 Smithview building. Husband owns 50% of Tooth Enterprises, LLC and Wife owns the other 50%. Husband purchased the land for 619 Smithview for $120,000 in 2002. The construction of the 619 Smithview building cost approximately $1.1 million. Husband had the building appraised for purposes of this lawsuit at $950,000. Wife had the building appraised at $970,000.

Husband moved his practice into the new office building at 619 Smithview in March of 2005. Husband then closed the practice's Knoxville location and original Maryville location. The new Maryville office at 619 Smithview is 6,400 square feet and has a main treatment area with eight chairs, two additional chairs for records to be taken, two individual rooms for new patient examinations and consultations, and a second floor which holds a break room for employees, Husband's personal office, and Husband's personal music studio where he keeps his musical instruments. Husband purchased approximately $300,000 in new state-of-the-art equipment for his practice around the time that he moved into the 619 Smithview building. Husband testified that he has purchased approximately half a million dollars in new equipment for his practice since 2001.

When Husband had the original Maryville office, he was paying $3,000 per month in rent. Husband arranged for the practice to pay Tooth Enterprises, LLC $11,000 a month in rent for the 619 Smithview building. Husband testified that Tooth Enterprises, LLC was set up, and the rent for 619 Smithview was set at $11,000 per month for tax purposes.

At the time Husband purchased the practice in 2001, Dr. Pryse was grossing approximately $550,000 annually working four days a week. Approximately three years after the purchase, in 2004, Husband had increased revenues of the practice from $550,000 to $1,250,000. Husband testified that in 2007 his practice had "about $1,050,000 or $1,060,000" in revenues. Husband testified that typically his patients commit to a treatment program and the "[a]verage orthodontic treatment time is about two years, twenty-four months." Private pay patients pay around $5,400 or $5,500, and TennCare reimburses Husband $3,600.

When the trial began, Husband's practice was open on Monday, Tuesday, and Wednesday from 8 a.m. to 5 p.m., on Thursday from 8 a.m. until noon and closed on Thursday afternoons, and closed all day on Fridays. Husband was working only three and a half days a week at that time. Husband testified that on Mondays, Tuesdays, and Wednesdays, he would take a two hour lunch break. When he testified again nearer to the end of trial, Husband admitted that at that time he was working only three days a week, Tuesday, Wednesday, and Thursday from 8 to 5. When asked why he changed his schedule,

Husband explained: "since I had to still be in Maryville on Thursdays for the Rotary Club meetings, it just made sense." Husband admitted that when he worked three and a half days a week he was working twenty-five hours a week, and that under his three day schedule he is working twenty-one hours per week.

Husband testified that he collects around 90% of his account receivables. Husband admitted that although his expert valued the practice at $224,000, he would "be upset at receiving that number …," if he were to sell the practice. Husband also admitted that if he were to sell his practice he would expect to sell his equipment, his patient charts, his goodwill, and his accounts receivable. Husband's financial statement dated June of 2004 showed the value of 70% of Husband's practice to be $350,000. Husband testified that his accountant came up with that value. On Husband's financial statement dated August of 2006, Husband listed the value of 100% of his practice at $500,000 and his yearly salary, bonuses, and commissions at $350,000.

Husband testified at trial that he draws a salary from his practice of $225,000 annually. Husband admitted that the practice also had purchased personal items for him including a 40-inch LCD-HD TV, and paid for some of his personal expenses including car payments, car repairs and maintenance, and gas. Husband admitted that sometimes he would charge personal expenses to the practice credit card, and stated: "there are expenses that the PC pays for on my personal behalf." The practice pays fees for various associations Husband belongs to including the American Association of Orthodontists, the Rotary Club of Maryville, the American Association of Orthodontists Foundation, and Leadership Blount. The practice also has paid for six season tickets for University of Tennessee ("UT") football. Husband admitted that the practice made a $3,000 donation to UT in order for Husband to be allowed to purchase the season football tickets for the ticket value price. Husband admitted that in 2006, in addition to this $3,000 donation, the practice paid $17,094 for these six UT football tickets, which Husband stated was the actual cost of the tickets. In 2007 the practice paid $1,863.69 for UT football tickets. In 2007, the practice paid $1,100 to Parent/Child Services for the parties' oldest daughter's speech therapy. The practice paid $972.25 for a cabinet and plastic insert dividers to store CDs, and Husband admitted at trial that this was a personal expense. The practice pays Husband's fitness club fees, and also has paid for haircuts, LAWeight Loss fees, and clothing for Husband. The practice has paid for Husband's personal meals and Husband's Blackberry. In 2008, the practice paid for a massage for Husband, and flowers that Husband testified were for Wife and the Children for Valentine's Day.

Husband testified that the practice loaned $5,000 to Warren Scott, whom Husband described as "computer technical support" person. When Mr. Scott paid back the loan, Husband put the money into his personal account. The practice loaned April Belcher

$2,000 and when the loan was paid back, Husband again put the money into his personal account. The practice loaned Melinda Subring $1,200, which Husband testified never was paid back.

Husband admitted at trial to having numerous adulterous affairs during the marriage and to having sex with these women during his lunch hours and on Fridays when he could have been spending time with the Children, who were in daycare or after-school care. Husband admitted that until sometime during the pendency of this divorce litigation he had always chosen to take Thursday afternoons and Fridays and spend them the way he wanted to without the Children. Husband never picked up the Children early on Thursdays or on Fridays. Husband also admitted that Wife did not know about his extra-marital affairs at the time Husband was engaging in them. Husband admitted that even though he had been asked during his deposition, he had lied about the number of extra-marital affairs he had over the years. At trial he admitted to several more affairs than he previously had testified about including one that occurred while Wife was pregnant with their first child, and one that occurred while Husband was an orthodontic resident and Wife was working to support the family. Husband admitted that he closed his office early one Tuesday and kept it closed on Wednesday morning so that he could attend a concert in Atlanta with his girlfriend.

Extensive testimony was elicited about Husband's numerous hobbies. Husband began taking flying lessons in January of 2006. Husband started running in 1999, and in late 2006 and early 2007, he trained for a marathon. His training involved running five or six miles a night three or four times a week, and doing a distance run of 18 to 20 miles on the weekends. Wife cared for the Children while Husband was running. Husband did not run in the marathon he was training for, but did run in a half-marathon in 2006 and another in 2007. Husband admitted that over the years he has spent considerable time going to concerts during which time Wife has taken care of the Children. Husband stated: "some of the concerts would be with my wife joining me, although that was infrequent." Husband admitted to using marijuana in April of 2006 during a Navy reunion. While Husband was at that reunion, Wife was at home taking care of the Children.

Husband is required to have 30 hours of continuing education every two years in order to maintain his orthodontia license. Husband obtained 80 hours every two years and admitted that time obtaining these extra hours was time away from Wife and the Children.

Husband moved out of the marital residence in February of 2008. In August of 2008, Husband became involved with the Foothills Community Players, a local theater group. Husband is on the board of the Foothills Community Players. From late April to early June of 2009, Husband was involved in producing a play. In early June of 2009 while producing the play, Husband left the Children in his car on two successive nights while he

went into the theater. The play practices were held in the Alumni Gym at Maryville College, and the car was parked behind the gym. The play practices were from 6:30 or 7:00 p.m. until 10:30 on those nights. Husband stated "I was in the car 70 percent of the time with them."

Husband admitted that he never asked Wife to keep the Children during this time and never hired a babysitter either. Husband stated:

> I dealt with the circumstances I had to at the time. A babysitter wasn't available for me. I had tried calling Laura Nashita. I didn't have any other babysitter at the time. And I didn't feel comfortable going to [Wife] at the time asking her to watch the kids in my stead.

Even though Husband claimed he was not comfortable contacting Wife about keeping the Children, Husband admitted when asked that he had just asked Wife to switch two days and that he could have asked Wife to switch for those nights also, but he chose not to do so. Husband stated: "for the very same reason that if I had, I feel like that I would be talking about how I put my interests ahead of my children. So I was sort of in a Catch 22." Husband admitted at trial that he put his own play production interests first and that he did not want Wife to know that he was involved in the play.

Husband testified that one of the reasons he became involved with the theater group was to promote his and the Children's interest in theater. Husband admitted, however, that his older daughter was in a drama performance in July but he did not attend because he chose to go out of town to Virginia Beach with his girlfriend.

The Children attend school at Webb School in Knoxville. Even though Webb requests that all parents attend a back to school meeting in August, Husband did not attend the meeting in August of 2008. Husband testified that the meeting was for kindergarten for the parties' youngest child, and Husband stated that he already had gone to a similar meeting two years earlier for one of the older children. Husband also claimed that he stayed home because he had the Children that night and was unable to obtain child care. Husband admitted that Wife had offered to obtain a babysitter for the Children so that Husband could attend this meeting, and Husband declined that offer.

In March of 2009 Husband made an offensive remark to his older daughter about her weight after one of the child's soccer practices. The child was in the third grade at the time, and she became very upset and started crying. With regard to the child's weight, Wife testified:

> Actually, she's not overweight. Unfortunately, when she was playing soccer, her dad came up during practice and patted her on the belly, kind of pointing and saying, what's that all about? And it was right in front of her friends. It was very embarrassing. And she cried all the way home…. She was upset that her daddy had pointed that out, especially in front of her friends, because she's not a fat little girl.

Husband admitted at trial that he was not sensitive to his daughter's feelings when he made that remark and that he regretted it.

In August of 2009 on one of the nights when he had the Children, Husband took his girlfriend to a concert. He hired a babysitter to stay with the Children. The babysitter was a fifteen year old who never had babysat with the Children before. Husband testified: "She came over prior to the first baby-sitting event and played with the children for about an hour while I met her father." Husband admitted that he was away from the Children that night for approximately seven hours.

Husband admitted that he also does karaoke and that he has to go out to engage in that hobby. Husband admitted that he has a MySpace page and a FaceBook page and that he spends quite a bit of time on his computer. Husband also admitted that he has had multiple e-mail accounts including one called 'orthogod,' which he has used, and still was using at the time of trial, to find women.

An exhibit was introduced at trial showing e-mails discussing sexual topics that Husband had sent to one of his girlfriends on Father's Day when Husband had the Children. Husband admitted to having an e-mail exchange with one of his girlfriends in which he stated: "This week is shit. I have the kids from Wednesday on and then fly out to Allentown for the weekend. If we don't meet tonight, then it will have to be next week, unless we do quickie lunches…." He testified that in that e-mail he "referred to the fact that I had a very tight schedule that week, that it was a difficult week for me."

Husband was asked about his daughter's soccer practice that occurred right before Labor Day. He attended the soccer practice during which the soccer coach informed parents that the next soccer practice scheduled for the Friday of Labor Day weekend was cancelled. Husband did not convey this information to Wife. When asked why he did not tell Wife, Husband stated: "I did not convey that because I did not hear it at the time. I missed it for some reason." When asked if he failed to hear the information because he was texting on his Blackberry instead of listening to the coach speaking to the parents, Husband stated: "I don't recall, sir." Husband admitted that he texts on his Blackberry a lot. Husband

admitted that Wife and the Children showed up for the soccer practice on that Friday night, and Husband stated: "I apologized for inconveniencing [Wife]."

Husband admitted that the Children are doing well under the current schedule. Husband admitted that he has no complaints about Wife's parenting of the Children. Husband admitted that for Christmas and birthdays Wife was the one who purchased the presents, and when the Children had a birthday party to attend Wife also would purchase a present. He also admitted that Wife purchased the Children's school uniforms and clothing.

Wife testified about obtaining her job as an assistant city attorney in the City of Knoxville Law Department. She stated that she obtained the job because Husband "was starting to complain a little bit about money …." Wife testified that she did not consider working full time in private practice when she was searching for a job. She stated:

> [M]y father is an attorney. My father works in private practice. He's been in a firm as well as a solo practitioner. I know the hours that it requires to do a good job. And if I do a job, I want to do a good job. So my kids take first priority and always have…. For the most part, my hours are 8 til 4:30. If necessary, I am able to skip lunch so that if I need to be at the school in the afternoons. Plus, the bosses I've had, the law directors I've had since I've been here have been very good about letting me attend school functions, be it VIP in kindergarten or working rehearsals for the class play. I have been able to do those kinds of things. I don't know how a private practice would be.

When asked what activities she was involved in prior to the separation, Wife stated: "Work, church and home…. My kids take first priority. With three of them, with so many extracurricular activities, that's what I do. It's my kids and church." Wife testified that prior to the separation:

> [Husband] flew his plane; he ran, got ready for marathons; he met with dentists. He had several dental associations where he would meet with them on Tuesday night, sometimes Thursday night. So on those nights when he was at those meetings, he wasn't helping with the kids. What other activities? He was a member of Blount Library on their board. He did Leadership Blount one year, which is a high level of volunteer activity. He was in Rotary. He currently is president of Rotary. I'm sure there are others. I just don't know all of them…. There were weekly meetings at lunch. He was on several committees in Rotary, so he said he had meetings in the evenings for Rotary. He would travel out of town for Rotary. He also traveled out of town for Leadership Blount.

Wife took care of the Children while Husband was engaged in his many activities.

Wife further testified:

> He said he would run on Thursday afternoons and during his two-hour lunches, he said he would run. But when you're preparing for a marathon or half marathon, which is what he was doing, you have to run like a 12-mile distance or even up to an 18-mile distance at certain times during that preparation. And that happened on many Saturdays. He would be gone for several hours doing that.… [H]e went for several [flying] lessons. You actually have to put in a certain number of hours in order to get your license. He had to actually fly. He did a lot of that on Friday. I don't know if he did it on weekends or not. But definitely on those Fridays.… [H]e loves to play music. And so when he would go into his office, he often times would be online downloading music. He had a guitar; he had a piano. He got interested in karaoke contests. I don't know if that was around the American Idol time. But they would have karaoke contests. And he would go to a place called Bull Feathers to participate in the karaoke contests in the evenings during the week.

With regard to Husband's involvement in Leadership Blount, Wife testified:

> [Husband] met monthly. He may have met more often than that with the smaller groups. But he definitely met monthly. It was an all day thing. He also had to travel to Nashville for that. They had retreats that they would go on. I couldn't tell you any more than that. I just know that he was gone. He was gone constantly because of Leadership Blount.

When asked how she managed getting the Children to two places at once while Husband was engaged in his various activities, Wife stated:

> Well, I took them or they - - And I tried to be in two places. Like you drop [the oldest child] off at speech therapy, which is two hours. You drop her off, and then I would drive the other ones to soccer practice, and then race back across town to pick them up if he was at a - - pick [the oldest child] up if he was at a meeting.

Husband takes a two hour lunch break. To Wife's knowledge, prior to the separation Husband never took advantage of Webb's open door policy in order to have lunch with the Children.

Wife was asked what weekends were like prior to the separation, and she stated:

> Depending on what was going on, if it was soccer season, our Saturday mornings were full of soccer. You would go have birthday parties. I would run errands that needed to be done, as far as getting things for the kids, grocery shopping, those kind of things, mowing the grass, doing work around the house. I occasionally went and visited my family with the kids.

Wife was asked what Husband's involvement with the Children was like on the weekends, and she stated:

> He was there, unless he was off doing his own activities like the running and flying. He was there, but he wasn't really there, you know. You can be in the building but not really be focused on the kids. That was the kind of thing.…
> He would be on the computer. He might be on the phone. At some point, he bought a laptop computer, so he would be moving around on his laptop. He started e-mailing on his phone. He occasionally would do a load of laundry, so the laundry would pile up. He would mow the grass. So he might be outside mowing the grass on the weekends.

Wife testified: "Most of the housecleaning, I did. We did, fortunately, have a housekeeper, at that point in time, that came once a week that would do the big housekeeping things. But the rest of the housecleaning was primarily my job."

During the 2005-2006 school year, the oldest child was in first grade and the younger children were in preschool and daycare. Wife would help the oldest child with homework. When asked if Husband ever helped with homework, Wife stated: "Very rarely." Wife purchased the Children's school supplies, clothing, Christmas gifts, and birthday gifts. When the Children were sick, Wife was called. Wife took the Children to their medical appointments.

When asked about the Children's activities prior to the separation, Wife stated:

> At that point in time in 2008, the girls had moved over to Webb. So [the older daughter] was in second grade and [the younger daughter] was in kindergarten. [Our son] had moved over to Nanny's part-time - - well, full-time, but it quickly changed from Nanny's in the fall of 2007 I guess. That schedule, at that point in time, was Monday afternoons [the younger daughter] started dance, it was around 4:00, 4:15. So I would skip lunch every Monday, and I

-10-

would go and pick up the girls; get [the younger daughter] ready for dance, take her to her dance class. Run down Kingston Pike from her dance class, which was in Farragut, to Nanny's, which was right on Kingston Pike, I would pick up [our son]. We would race back down to pick up [the younger daughter] from dance.

At that point in time, I would change [the older daughter] into her dance clothes because she had dance soon after. I would get them something to eat. Before [Husband] moved out, he would roll into the parking lot where the dance club was usually between 5:30 and 6:00, and he would take the younger two home. [The older daughter], I would stay with [the older daughter] another hour or so because she had two dance classes, one back to back. So that was Mondays.… And we went to speech therapy on Tuesday nights. And I would skip lunch because speech therapy was right at 4:30 to 5:00. And I had to get them back all the way from Webb down Middlebrook. And so I would skip lunch, pick up the girls, and take them - - take [the older daughter] to speech therapy. And then at that point in time, [our son] was at Nanny's - - or I'm sorry - - at Tate's, and so I would pick [our son] up as well.… Wednesdays, depending on the time of the year, Wednesdays might be our only time to get to go home and have dinner as a family. And so if we could do that, we did that. If it was soccer season, we were likely to be on the soccer field for a couple hours.

On Thursdays, the Children had soccer. On Friday evenings, the parties' younger daughter and son would have soccer games. When asked if she ever had missed a soccer practice, Wife stated: "Not that I can recall.… I was either at another soccer practice or at speech therapy."

When asked what Husband's involvement was with their daughter's speech therapy, Wife stated:

He went to the initial assessment with me. Well, she was assessed at school. And after we got our report, we met with the speech auditory processing therapist. And she discussed the plan of action. And then I would go every week. And [Husband] - - I can't remember when [Husband] first went. It was after she had probably been in therapy a year or so before he ever went once. And since then, I think he's only been a couple times. Most of the time it's been to discuss when can we stop this therapy.

Wife testified in detail about how she helped the Children with their homework. Wife testified that Husband's involvement with homework was "[v]ery minimal." Wife was asked who prepared meals on Thursday afternoons and Fridays when Husband was off and she stated: "I usually prepared the family meals. He might order pizza maybe. Occasionally, he would cook." Wife testified: "In the evenings, [Husband] was usually in his office on his computer in the evenings." When asked what she would be doing while Husband was in his office, she stated:

Depending on the time, I was cleaning up dishes, helping [our older daughter] with her homework, playing a game with the kids, reading with the kids. We tried not to watch a whole lot of television during the school week, but occasionally they would get to watch a half hour of TV. So I would be in the family room where they were.

Prior to the separation, Wife communicated with the Children's teachers at Webb and attended parent/teacher conferences. Wife also was the one who communicated with the parties' son's daycare teachers prior to the separation. Wife testified that Husband communicated with the teachers minimally and did not attend those parent/teacher conferences. Husband could recall attending only one parent/teacher conference prior to the separation.

Wife explained about kindergarten at Webb stating:

For example, in kindergarten they have a VIP program. Very Important Parent is what they call it. And so they sign you up. Voluntarily or involuntarily they sign you up on a calendar. Because I work, I contacted the teachers very early on and said, is it okay that I ask for a particular day to work out my schedule? And they were very gracious in doing that. The time commitment is just a couple hours, usually from 9 to 11.

And I think they schedule that way so that you can go on to eat lunch with your child right afterwards. When you eat lunch with them, then they encourage you to leave because the transition is very smooth. They're going to go out and play. And at kindergarten, a lot of those kids have never been away from their parents. So that transition was really good.

Usually, you volunteered once a month, once every other month, depending on parental involvement. And they ask both parents to participate, both the moms and the dads.

-12-

Wife participated in the VIP program. When asked if Husband participated, Wife stated:

> [Husband] did reluctantly. He was assigned VIP. He complained about it, saying, we're paying too much money for me to have to be doing this. But he did go. I do recall a time when he was signed up and then for whatever reason couldn't go, and I had to go for him.

Husband admitted that he complained about the requirement that parents do VIP duty in their child's kindergarten classroom at Webb and admitted saying "as much as we're paying Webb, you know, I don't see why I would have to go out there and help teach." Wife testified that Husband would have been a VIP on a Friday, which was his day off.

Wife would stay and have lunch with her child after being a VIP. She stated:

> When I was there for VIP with [our younger daughter], I would stay for lunch. I do know of one particular occasion that [Husband] was assigned to go to VIP, and he did not stay. [Our daughter] was very upset about that.… He told me later. I think he said he was either flying or having lunch with his accountant.

Husband admitted that on one occasion when he was a VIP in his daughter's kindergarten class his daughter wanted him to stay and have lunch with her but he instead chose to leave so he could go flying, and that his leaving upset his daughter. Husband admitted that he did not put his daughter first on that occasion.

Wife testified about when Husband moved out of the marital residence stating:

> He left. We didn't really even talk about when he was going to see the kids again. So a couple days later I sent an e-mail saying, here is what I propose. It was every other weekend and dinner on Wednesday nights; not an overnight, just have dinner with the kids. And of course, he could see them any time he wanted to at their school activities. I never ever said he couldn't. And I never have said that. And then that's pretty much what happened throughout the end of February and throughout the month of March.… Towards the end of March, at some point he made noises about how he wanted them for Thursday night overnights. And he sent me an e-mail saying, My team thinks I need to have more time with them. At that point in time, I believe he thought I was going to move with the kids back to Middle Tennessee where my family was. And I remember him saying, My team thinks that I need them. Because it wasn't that I want to spend more time with them or they need more time with

-13-

me. It was, My team thinks I need them.… I assume for legal purposes, he didn't want me to be able to move, so he wanted more time with the kids.… I don't know who his team was.

Wife further stated:

He started asking for Thursday night overnights. And I thought it was important, especially for the kids and being the ages they were, that they spend the night at the home, at their home, spend the night every night during the school week at their home because of stability purposes. Once again, I have got a situation where I have got a son who has got anger management issues that we're dealing with, and a daughter with auditory processing disorder. And I'm the one who's primarily doing the homework with them. It seemed right, at that point in time and now, to have as much stability in life as possible.

Wife and Husband reached an agreement that Husband would bring the Children to church on his weekends so that the Children could attend church with Wife. After Wife amended her complaint to allege adultery, Husband became angry and did not bring the Children to church for several weeks. Husband then resumed bringing the Children as per the agreement.

Wife testified that she and Husband reached a temporary agreement in August of 2008 about the Children's schedule and that they have been operating under this schedule since that time. Wife testified that this schedule has worked "[f]or the most part, pretty well. There have been a few missed homeworks and a few times when there has been a scramble to get some things done. But for the most part, well." Wife worked with her parents and Husband's parents to coordinate the Children's summer schedule so that both sets of grandparents would have time with the Children during the summer.

Wife's proposed parenting plan included a provision that Husband be responsible for ensuring that homework is completed for the Mondays following his weekends and the Thursdays after he has had the Children overnight. Wife explained:

We put that because what I was finding was when we first started this, he had Wednesday night dinners every other Wednesday night. And they would get home about 7:30, which was around their bedtime, and he wouldn't be getting their homework done. And so I was sitting down with … my oldest child, sometimes til 8:00 or 8:30 to 9:00 trying to get homework done when she was already tired. And so homework is an ongoing situation with these children.

They have a lot of it. Webb is a difficult school, especially for [my oldest child]. [My younger daughter] it seems to come more easily. She doesn't have as hard of a time getting her homework done. But for [my oldest], it's an ongoing struggle. And it's going to be the same for [my son]. We just found out this fall that he has auditory processing disorder as well.

Wife testified:

There have been times when their homework wasn't done. An example showed up in [our younger daughter's] report card in kinder - - first grade where she had reading assignments for the month of October. And that particular time there was - - he had fall break, plus he had Wednesday nights, and you're suppose [sic] to read with the child every night and record it. It didn't happen at all the entire time. I was the only parent that did that with her.… You were suppose [sic] to initial that they had read and report it back on a - - there was a sheet of paper. And it was in her folder every day.… At different times certain projects haven't been done. At this point in time, if there is a school project that's more than a one day assignment, I have been doing it with the children. The kids, in fact, pretty much say, we want to do it with you, Mom, I think because they don't want to stress their dad out on the Wednesday nights he has them.

When asked if there had been lapses in terms of the Children completing homework when they were with him, Husband stated: "It was never intentional."

Wife testified about a book report that the younger daughter was required to do for school stating:

The first part of the project was due last week. She finished her book. We initialed that and signed off on that. The next step in the project was due today.… [Husband] had the children this past weekend.… We had started the second step on the project before she left on Thursday, because unfortunately, he has got a habit of not doing those projects with the kids. So I was worried if we saved it all up until Monday we wouldn't be able to get it done. So we did part of it, about half. Unfortunately, they had not done any of it over the weekend. We had to stay up late last night to do the homework.

Husband admitted that there have a "been [a] few" occasions when he has had the Children and homework was not completed. He also admitted that the younger daughter had missed

eight nights of reading, and often arrived at school without her reading sheet during the time that she was in his care.

Wife testified that she discovered at the end of September of 2008 that Husband was unaware that their older daughter's spelling tests were on Thursdays, and had not been working with the child, despite the fact that this information was in the child's folder and on the school website. Wife gave another example of Husband not checking backpack folders stating:

I know he hasn't checked their backpack folders every day. A recent example is [our younger daughter]. And she's in second grade now. They have this program called Donuts for Dads, which is usually on a Friday. And this particular weekend they were sent home, the paperwork for Donuts for Dad. And you had to sign to make a reservation that you were going to be able to come.

So on Monday night - - this just happened a few weeks ago - - Monday night I opened up her backpack to check her homework, and it looked like it hadn't been touched all weekend. And the Donuts for Dad form wasn't filled out. I knew he was planning to attend because he had mentioned it to me. So immediately, I had to call him and say, this form is due tomorrow. Are you still planning to go? And so I had to fill out the form for him. I know he didn't look in the backpack, because he had it all weekend and hadn't seen it.

When asked about the Children's behavior after they have been at Husband's house, Wife stated:

There have been occasions where they have used profanity that I don't think is appropriate for their age. For example, [our older daughter] said, you're pissing me off, to her little sister. And based on [our younger daughter's] comment, her daddy told her that. They have been called stupid by their dad. And they have used the word stupid more often than they ever did before. Stupid is a bad word at our house. I know it may not be in everybody's, but it's still a bad word in our house.

They have been mentioning, especially lately, conversations with their dad about the trial and that their dad is telling them that we are fighting over week-on/week-off. And they asked me, why you don't want [sic] dad to have week-on/week-off?

And so you can't tell them. That's not appropriate. I just pretty much say that it's an adult conversation that needs to be determined by the grown-ups.

Husband testified: "I have not called them directly stupid. I said probably that something that they did was stupid." Husband admitted that he has cursed in front of the Children.

Wife testified that she does not talk to the Children about this litigation. Wife stated:

I answer their questions as best I can, if they bring it up. But if it has to do with court, if it has to do with divorce, if it has to do with seeing each other as far as the amount of time, I simply say, you're going to see your dad, you're going to see your mom, and we both love you. It's not for their best interest to know that we're arguing. And when [our son] comes in and says, you're fighting with Dad, so I don't have to tell you things, I just don't see how that's helpful.

Wife was asked about adult issues that the Children had discussed with her and she stated:

Well, other than using the language, the grown-up language that we talked about yesterday, there have been issues with regard to the divorce and court, issues with regard to [our younger daughter] - - We were at a soccer game. And it was [Husband's] weekend. And I simply gave [our younger daughter] a hug and said, call me if you need me. I think they were working on some homework.

And she responded, Daddy says we never need you.

And I didn't even know what to say to that. It was just so surprising. And they were getting in the car. And I noticed in my rearview mirror, [Husband] was yelling loudly, I mean, I could hear it through the car, yelling at her.

So that next day on a Sunday, they had a soccer party. And for whatever reason, that was one of those Sundays he did not bring the children to church. After that soccer party, the kids, at this point in time, were returning home with me on Sunday afternoon to spend the night and then go back to

school, [our older daughter] brought up, you know, [our younger daughter] lied about that; Daddy never said that.

And I said, you know, I'm here for you guys no matter what. And I just left [sic] that go. Because what do you say at that point? Obviously, they have been talking about it since [our younger daughter] made that comment.

Wife testified: "[Husband] has spent more time with those children in the past two years than he spent in the six years before he left with the kids." Wife testified that since the separation, Husband has gone to lunch with the Children, taken them to some appointments, attended the Children's musicals, and attended more soccer practices and games than before. Wife was asked what happens with the Children during days off of school and in-service days and she stated:

For the most part, if it's [Husband's] weekend and it's a Friday in-service, he will take them. And what he does with them, I don't know. If it's an in-service day where I have them or if it's during the middle of the week, I usually take off work. Which it is amazing, considering what he was doing in January of 2008, right when he was moving out, there was a Martin Luther King holiday - - I'm sorry - - President's Day holiday, which the city doesn't get off, and there was an in-service day, so he had to watch the kids. And he was complaining. We pay too much money for me to be having to watch those kids, and even though it was his day off.

Wife testified that, since the separation, Husband has missed some of the Children's extracurricular activities. She stated: "He has missed soccer practices. He has missed soccer games. He missed [our younger daughter's] drama performance. He didn't go with [our son] to his assessment when he was assessed at Webb. He missed a parent/teacher conference." Wife testified that Husband missed soccer games in the spring of 2008 because he was at a concert with his girlfriend.

Since the separation, Husband has attended some joint parent/teacher conferences, and Wife testified:

[I]n [our older daughter's] conference, right after Ms. Meyer has been talking about how [our older daughter] is hearing a lot of adult information, and she's concerned about that and we need to watch that, [Husband] talked about, well, everybody needs therapy, and went on to talk about his singing aspirations. He did bring in that [our older daughter] loves to sing, but here is what I wanted to do when I was a singer. And that was one child's class.

In [our son's] class, we're sitting there, and they're talking about all these issues that [our son] is having. At which point I say, oh, maybe he has auditory processing disorder that [our older daughter] does. And somehow the topic got around to Tate's. And [Husband] said something to the effect of, well, I hope they've reserved a place in hell for Lewella Tate. And it's like, okay, I'm leaving this conference and talking to them another time.… We had just left [our younger daughter's] conference where he called his child a ball buster, which I also don't necessarily think is an appropriate way to call your eight-year old.

Husband admitted that he made the comment about their younger daughter being a "nut buster."

Wife testified that prior to the separation, Husband would not make medical appointments for the Children. Wife testified:

The only medical appointment that he has made since separation were dermatological appointments for [our older daughter]. He scheduled - - and I guess it was [an older daughter and son] appointment. He went to one and then scheduled another appointment on a Friday morning. He didn't let me know about it until the Thursday before, and called and said, can you take them? So I ended up taking [our older daughter] to her skin doctor appointment.… I found out later that he was in Nashville at a concert and didn't get back. He was with his girlfriend at a concert.

When asked how she would describe Husband, Wife stated:

[Husband] has a short fuse. He gets angry quickly. He doesn't have a lot of patience. He is loud. He loves his children and they love him.… With regard to [the Children], they need structure, and they need guidance and they need to feel safe. He's called them stupid. He's flicked them on the top of the head. He's used inappropriate language around them. He's left them alone in the car for hours to the point where they were scared.

Wife testified further about the incident when Husband left the Children alone in the car at night stating:

At that point in time, we had agreed that he would have the kids two nights during that week, Wednesday and Thursday. He called a few days earlier and asked if I would swap. And so I took the children. I agreed to take the

-19-

children on Thursday, and he took Tuesday. So he had them Tuesday and Wednesday nights of that week. When I picked the kids up on Thursday, I picked [our daughters] up first.... And [our older daughter] was very tired.... I said, Why are you so tired?

And she said something about how she had to stay up until 10:00, which upset me, because that's way past their bedtime. Even during the summertime, they usually don't stay up that late during the week, because they go to camp.... So at that point, [our older daughter] said that they had to sit in the car for a bunch of hours the night before.... She said, we were down in Maryville. Daddy was in a play - - or Daddy was watching a play.

And I just didn't understand that, because he had asked me to swap Thursday, and then kept Tuesday and Wednesday were his days, but still kept them in the car those two days.

Wife testified about the Children's birthdays since the separation stating:

I am basically the person who talks to the kids about what they want to do for their birthday. You have to do a little bit of research. I get the invitations ready. I typically get birthday presents. Now that he's out of the home, he gets his own birthday presents for the kids.... I always talk to him before we set anything in stone and make sure he's fine with the date. He's always there at the party, and certainly invited to the party. Unfortunately, I think it was last year for [our son's] birthday party at his preschool, [Husband] chose not to come. We did a little party in the classroom. And I let him know of the time and date.

Wife began dating someone during the pendency of this suit, and she testified that she sees him on the weekends when she does not have the Children or occasionally for lunch. Wife has not introduced this man to the Children. Wife testified that she never has hired a babysitter so she could go on a date. She stated: "The only time I've had a babysitter was because I had a work commitment." Wife had hired a babysitter two times in the two years prior to trial, and she explained: "I had to come before City Council to announce an ordinance, I think it was the Booting Ordinance. And then I went to the school for an hour for the parent conference that we discussed earlier."

Angie Crabtree, the lower school director of the elementary school at Webb, testified that she could not recall ever seeing Husband prior to the separation, but stated that

Husband has become more involved with the Children's school events since the separation. Ms. Crabtree testified that Wife always has been involved at Webb. Ms. Crabtree stated:

> I have seen [Wife] volunteer for Webb Fest, which is a week long festivity that we have like a homecoming. I have seen her volunteer in the cafeteria for activities. I have seen her volunteer at holiday parties. I don't know if she's been on field trips. But I also know that she's attended other special events or coffees that we have had at the school. I have seen her have lunch with her children.

Ms. Crabtree stated that Wife has been involved consistently with Webb.

Much testimony was elicited about the value of Husband's orthodontic practice. Both parties produced experts who testified on this subject. William Robert Vance, Jr., Wife's expert, valued the practice after taking out the debt at $700,000. Mr. Vance gave his opinion based on fair market value. When asked what was significant in terms of the practice's background, Mr. Vance stated:

> Well, the practice that operates today was originally purchased from a Dr. Pryse in August of 2001 for $250,000, which included equipment and patient records and goodwill and that sort of thing, and the work force which was an assembled work force, the patient charts, and, as I said, the operating equipment. They had two locations, Knoxville downtown, and in Maryville, not the location they're in now. Seven full-time employees and one part-time employee were retained in the purchase transaction.…

> And all of that then was moved and consolidated into the Maryville location after the new building was built. And my information is now that there are five chairside assistants that produce revenue and braces for Dr. Eberting.… [F]rom the information that I had, the revenues has [sic] more than doubled, well, almost doubled from the gross revenues were about $550,000 at the time of the purchase. Now they are - - or as the last information we had, the full year in 2007 was what we had at the time, it was a million sixty, $1,060,000. Therefore, it's more than doubled. And Dr. Eberting attributes that to marketing efficiency and raising treatment fees.

> Also, it would be attributed to the new location. It's a state-of-the-art facility, state-of-the-art brand new equipment. At least it was brand new back in '05. And it is apparently a very state-of-the-art operation now. It's a 6,400 square-foot building that was built specifically for that purpose by Dr.

Eberting.… At the time, he was working only three and-a-half days a week. It was not open for business Thursday afternoon or Friday. So he was still able to produce $1,060,000 in revenue with a three and-a-half day week.

Mr. Vance also stated that the collection rate for the practice was "[a]pproximately 90 percent, which is - - I believe [Husband] said it was virtually 100 percent. But we're using 90 percent here, which is also what he said in his deposition, which is about typical for someone in the orthodontist practice at that level."

When asked about goodwill, Mr. Vance stated:

Goodwill or blue sky, whatever you want to call it, it is enterprise goodwill. It's not personal, because it is a very basic tenet, I think, in logic that someone is not going to purchase or pay for something of which they can obtain no value.… It's a catchall phrase. Just the basic definition of goodwill is what a business or a practice sells for or what it's valued at over and above its hard assets; hard assets being cash, receivables, and equipment basically, minus the debt. So if it sells for more than what those things were I just mentioned, well, then it has some goodwill or it's valued to have goodwill. And that goodwill is sort of an all encompassing term that could include an assembled and highly trained work force, equipment operating and in place, and a person is trained to operate that equipment. That's very important. Equipment in place and operating is worth a lot more than the exact same equipment sitting in a box or in a warehouse, because it's in place and it's operating. The location, a state-of-the-art facility in a location, repetition, recognition by the community. That's all very important. So location and convenience. And of course, the obvious one, the patient charts, the actual patient charts themselves have some value. Plus all of the referrals and all that go along. The families that go along with those patient charts and their neighbors and who they know and their friends, that's a good referral base. All of that rolled up together is goodwill, which gives you a value over and above your hard assets.

Mr. Vance also testified:

if you take my $700,000 value number and break it down among the hard assets, so to speak, cash, receivables, other deposits, and our estimate of fair market value, the total hard assets, so to speak, are $514,487. And you'll find those numbers basically on the balance sheet someplace. Minus the accounts payable, minus the installment debt equals a net equity of $269,000. And if you subtract $269,000 from our $700,000 value, there is an implied goodwill

in there of $430,622, because, as I said, a value or selling price that's over and above, goodwill is the value over and above its hard assets, so to speak.

When asked if the amount of goodwill were subtracted from his $700,000 if the resulting value would be $270,000, Mr. Vance stated: "That's correct, if you went with a net asset value method, which of course is not the real value of this company." Mr. Vance also stated: "If you were to strike the personal goodwill, this clearly has enterprise goodwill associated with it. It's not all personal to him."

Husband's expert, Walter James Lloyd, used an asset approach methodology and valued the practice at $224,000. When asked about goodwill, Mr. Lloyd stated: "Goodwill or intangible assets, which goodwill is one of, is the difference between whatever the value is, in this particular case, [Mr. Vance] is saying it's $700,000, and the actual tangible assets, which I determine to be $224,000. So that difference would have to be goodwill." Mr. Lloyd explained "The asset approach, basically, is the assets, the adjusted assets of the business less the liabilities." When asked if it made sense that he valued the practice at less than Husband paid for the practice in 2001, Mr. Lloyd stated:

I would be glad to answer that. Several things. One of which is the practice is substantially different today. I mean, it's like nine years have gone by. The practice is substantially different today than it was back then. It's in a different location. It's my understanding, from talking to Dr. Eberting, that $224,000 purchase price, or whatever was, was substantially related to the assets that were in the practice at that time he bought it. So in other words, the assets changed, the accounts receivable changes, the debt changes. So it's a moving - - it's not a static value.

And a substantial portion of that purchase price that he paid back then was related to a noncompete agreement. So I saw the - - I've got a copy of the agreement. We're not talking about a sale of the business. We're talking about what's the value of this business to this marital estate. And there is no noncompete agreement in this marital estate that I'm aware of. We're not talking about selling the business. So how that makes common sense is that there is no - - very little similarity to the business that we're appraising today as to the business that was back in 2001.

After the trial, the Trial Court entered its Final Judgment for Divorce on August 12, 2010, *inter alia,* awarding Wife a divorce, adopting a Permanent Parenting Plan, setting child support, dividing the marital estate, awarding Wife transitional alimony of $1,000 per month for ten years, and awarding Wife reasonable attorney's fees as alimony in

solido. Husband filed a motion to alter or amend. After further hearing, the Trial Court entered an order on October 29, 2010 *nunc pro tunc* to October 14, 2010, *inter alia*, amending the Permanent Parenting Plan with regard to the commencement of the Easter and Thanksgiving holidays, and awarding Wife attorney's fees and litigation expenses in the amount of $150,000 as alimony in solido. Husband appeals to this Court.

## Discussion

Although not stated exactly as such, Husband raises three issues on appeal: 1) whether the Trial Court erred in valuing Husband's orthodontic practice; 2) whether the Trial Court erred in not adopting Husband's proposed parenting plan; and, 3) whether the Trial Court erred in determining the amount of attorney's fees awarded to Wife. Wife raises as issues whether the Trial Court erred in distributing the marital estate, and whether the Trial Court erred in not awarding her all of her requested attorney's fees and expenses.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first consider whether the Trial Court erred in valuing Husband's orthodontic practice. With regard to this issue the Trial Court specifically found and held:

The main dispute between the parties in the area of property division concerns the value of the husband's orthodontia practice. The wife's expert testified that the practice has a value of $700,000.00. The husband's expert testified that the practice has a value of $224,000.00. The husband argues that the figure of $224,000.00 is the value of the practice's hard assets and that any value above that figure represents goodwill which is not part of the marital estate. The basic rationale, however, in the cases disallowing goodwill as a component of the estate in valuing a professional practice results from the inequity in compelling a professional practitioner to pay a spouse a share of an intangible asset at a judicially determined value that could not be realized by a sale or another method of liquidating value. *See Smith v. Smith*, 709 S.W.2d 588, 591-92 (Tenn. Ct. App. 1985) *citing Holbrook v. Holbrook*, 309 N.W.2d 343, 354-55 (Wis. App. 1981). However, in this case, it clearly appears erroneous for the Court to value the orthodontia practice at a value of $224,000.00 which is less than what the husband paid for the practice.

Granted the husband's purchase of the practice included a non-competition agreement from the selling orthodontist, but the husband testified that he would not be willing to sell his practice for the price of $224,000.00 without mentioning the inclusion or exclusion of a non-competition agreement. The Court finds and concludes that the value of the practice lies between $224,000.00 and $700,000.00. The husband himself, prior to the divorce, consistently stated the value of the practice, of which he now holds one hundred percent of the interest, to be $500,000.00 in his personal financial statements. See Trial Exhibits 6, 7 and 8. *See Carpenter v. Carpenter*, 2008 WL 5424082 (Tenn. Ct. App. Dec. 31, 2008). There is certainly nothing unfair to the husband in rejecting the value of $224,000.00 which he himself would reject, and adopting the husband's own value of $500,00.00 [sic] with which this Court agrees.

Husband argues on appeal that the value assigned by Wife's expert, Mr. Vance, of $700,000 should not have been accepted by the Trial Court because it incorrectly included good will. We agree that "professional good will is not a marital asset which would be accounted for in making an equitable distribution of the marital estate." *Smith v. Smith*, 709 S.W.2d 588, 592 (Tenn. Ct. App. 1985).

We disagree, however, with Husband's assertion that the Trial Court was compelled to have drawn its conclusion of the value of Husband's practice from the range between Mr. Vance's opinion minus goodwill and Mr. Lloyd's opinion. Such an assertion assumes that these two opinions were the only evidence presented with regard to the value of Husband's practice. Such is not the case.

As stated by the Trial Court, other evidence regarding the value of Husband's practice was presented at trial. Testimony was elicited with regard to the price Husband paid to purchase the practice from Dr. Pryse, a sale which the evidence shows did not include the value of accounts receivable. Evidence also was elicited with regard to the 619 Smithview building which was specially constructed to house Husband's practice, and the state-of-the-art equipment that Husband purchased when he moved the practice into the 619 Smithview building. While the building and real estate at 619 Smithview are not part of Husband's orthodontic practice, the fact that Husband's orthodontic practice is located in a building built specifically for an orthodontic practice at the physical location chosen by Husband as being where he wanted his practice located is relevant. In addition, evidence was presented about how Husband had significantly increased revenues since purchasing the practice from Dr. Pryse, despite working fewer hours than Dr. Pryse had worked. Evidence also was presented showing the values that Husband had assigned to his practice on Husband's recent financial statements. Furthermore, we note that the value assigned to the practice by Husband's expert

witness was less than what Husband paid for the practice years prior to moving the practice into a state-of-the-art location built specifically for the practice with state-of-the-art equipment purchased since Husband purchased the practice.

A trial judge, as the fact finder, is not required to check his or her common sense at the door when considering evidence. The Trial Court had before it evidence of values that Husband himself had applied to his practice, and had Husband's own testimony that he would be upset if he were to sell the practice and receive only the value assigned by his expert. The Trial Court found a value for the practice that was within the range of values presented by the evidence.

Even if we were to accept Husband's assertion that the Trial Court was compelled to find a value within the range presented by Mr. Vance's opinion minus goodwill and Mr. Lloyd's opinion, which we do not, then the Trial Court could have accepted the value of $270,000, the higher of these two values. This value is $230,000 less than the value assigned by the Trial Court. Even if the Trial Court erred in assigning a value of $500,000 to Husband's practice, which we hold it did not, we still would not say that this value renders the overall distribution of this marital estate inequitable because the evidence still would not preponderate against the Trial Court's overall division of this marital estate as being an equitable division.

Logically, we next consider Wife's issue regarding whether the Trial Court erred in distributing the marital estate. Wife argues she should have been awarded a greater percentage of the marital estate. As our Supreme Court has explained:

> This Court gives great weight to the decisions of the trial court in dividing marital assets and "we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures." *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996). As such, when dealing with the trial court's findings of fact, we review the record de novo with a presumption of correctness, and we must honor those findings unless there is evidence which preponderates to the contrary. Tenn[.] R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Because trial courts are in a far better position than this Court to observe the demeanor of the witnesses, the weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court. *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991). Consequently, where issues of credibility and weight of testimony are involved, this Court will accord considerable deference to the trial court's factual findings. *In re*

*M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)). The trial court's conclusions of law, however, are accorded no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

* * *

In a proceeding for divorce or legal separation, the trial court is authorized, prior to determining the support and maintenance of one party by the other, to "equitably divide, distribute or assign the marital property between the parties without regard to marital fault in proportions as the court deems just." Tenn. Code Ann. § 36-4-121(a)(1) (2005). The trial court is empowered to do what is reasonable under the circumstances and has broad discretion in the equitable division of the marital estate. *See Flannary v. Flannary*, 121 S.W.3d 647, 650 (Tenn. 2003). The division of assets is not a mechanical process and trial courts are afforded considerable discretion. *Manis v. Manis*, 49 S.W.3d 295, 306 (Tenn. Ct. App. 2001).

*Keyt v. Keyt*, 244 S.W3d 321, 327-28 (Tenn. 2007) (footnote omitted).

Further, our Supreme Court has instructed:

[M]arital property must be divided equitably between the parties based on the relevant factors enumerated in Tennessee Code Annotated section 36-4-121(c) without regard to fault on the part of either party. Tenn. Code Ann. § 36-4-121(a)(1). Section 36-4-121(a)(1) requires an *equitable* division of marital property, not an *equal* division. *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002).

*Larsen-Ball v. Ball*, 301 S.W.3d 228, 231 (Tenn. 2010) (emphasis in original).

Tennessee Code Annotated § 36-4-121 (c) provides:

(c) In making equitable division of marital property, the court shall consider all relevant factors including:

(1) The duration of the marriage;

-27-

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-4-121(c) (2010).

In her brief on appeal, Wife asserts that she should have received 60% of the marital estate rather than the 50% that the Trial Court awarded her because, she asserts, several of the factors contained in Tenn. Code Ann. § 36-4-121(c) "favored Wife substantially." In essence, Wife is requesting this Court tweak the Trial Court's distribution of the marital estate. We decline to do so. The Trial Court considered all the relevant factors in light of the evidence. A careful and thorough review of the record on appeal reveals no reversible error in the Trial Court's overall distribution of the marital estate.

Next we consider whether the Trial Court erred in not adopting Husband's proposed parenting plan. As pertinent to this issue, Tenn. Code Ann. § 36-6-106 provides:

(a) In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest

of the child.  The court shall consider all relevant factors, including the following, where applicable:

(1) The love, affection and emotional ties existing between the parents or caregivers and the child;

(2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that, where there is a finding, under subdivision (a)(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a nonperpetrating parent or caregiver has relocated in order to flee the perpetrating parent, that the relocation shall not weigh against an award of custody;

(4) The stability of the family unit of the parents or caregivers;

(5) The mental and physical health of the parents or caregivers;

(6) The home, school and community record of the child;

(7)(A) The reasonable preference of the child, if twelve (12) years of age or older;

  (B) The court may hear the preference of a younger child on request.  The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that, where there are allegations that one (1) parent has committed child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred….

(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and

(10) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child.

Tenn. Code Ann. § 36-6-106(a) (2010)[2]. Pursuant to Tenn. Code Ann. § 36-6-404, when entering a permanent parenting plan a court also shall consider:

(1) The parent's ability to instruct, inspire, and encourage the child to prepare for a life of service, and to compete successfully in the society that the child faces as an adult;

(2) The relative strength, nature, and stability of the child's relationship with each parent, including whether a parent has taken greater responsibility for performing parenting responsibilities relating to the daily needs of the child;

(3) The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interests of the child;

(4) Willful refusal to attend a court-ordered parent education seminar may be considered by the court as evidence of that parent's lack of good faith in these proceedings;

(5) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(6) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(7) The love, affection, and emotional ties existing between each parent and the child;

(8) The emotional needs and developmental level of the child;

(9) The character and physical and emotional fitness of each parent as it relates to each parent's ability to parent or the welfare of the child;

(10) The child's interaction and interrelationships with siblings and with significant adults, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(11) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(12) Evidence of physical or emotional abuse to the child, to the other parent or to any other person;

(13) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(14) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The

---

[2]Tenn. Code Ann. § 36-6-106 was amended effective June of 2011. We must, and do, apply the version of Tenn. Code Ann. § 36-6-106 in effect at the time the trial was held and the final order in this case was entered.

preference of older children should normally be given greater weight than those of younger children;

(15) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(16) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-404(b) (2010).

Husband raises two main arguments on appeal with regard to this issue. First, Husband asserts that consideration of "the issue of infidelity and sexual impropriety is not to be considered by the trial court in assessing custody decisions." Husband is not entirely correct. As this Court explained in *Sutherland v. Sutherland*: "Sexual infidelity or indiscretion does not *ipso facto* disqualify a parent from being awarded custody. However, when the parent's sexual activities or indiscretion involve neglect of the minor child, such neglect may be considered in relation to the best interest of the minor child." *Sutherland v. Sutherland*, 831 S.W.2d 283, 286 (Tenn. Ct. App. 1991).

Second, Husband argues that: "[t]here was no proof that an allowance of equal co-parenting time with the parties was not in the best interest of the children." We disagree. With regard to parenting the Trial Court made very specific findings in its Memorandum Opinion, which was incorporated into the Final Judgment for Divorce by reference, stating:

This [is] not a case where the Court has one loving parent and one unloving parent. Both parents love their children, and their children love both of their parents. The evidence establishes, without dispute, that the mother has been a devoted, attentive mother to the fullest with no competing interest or distraction. While working more hours than the father, the mother has been the primary caretaker for the children. Throughout the marriage, the mother permitted no interest to compete with her duties as a wife and mother. The mother has managed to maintain her employment in a municipal law department while remaining attentive to the needs and schedules of her children.

On the other hand, the father, while active in his children's lives, had several interests in conflict with his parenting of the children. The father has devoted time and energy to running and training for marathons, flying lessons, musical interests, service clubs, professional organizations, e-mailing, and sexual activity. The father has also rekindled his interest in participating in the theater.

Since the parties' separation, the father has increased his involvement with the children. However, he has not given up any of his competing interests. In contrast, the mother from day one has devoted all of her time and energy to the family. Even with respect to her job in a municipal legal department, she obtained employment outside the home in 2001 because of the husband's concerns about finances.

The Court has considered all of the evidence, as well as the statutory factors at Tenn. Code Ann. § 36-6-106, and finds and concludes that it is in the children's best interest that the Court adopt the parenting plan filed by the mother on October 3, 2009, with the deletion of the language, "Father agrees that the children are too young to be allowed to fly with him in his private plane."

The evidence in the record on appeal does not preponderate against these detailed findings by the Trial Court. Furthermore, we note that although Husband has, to his credit, made more of an effort to be involved in the Children's lives since the separation, Husband has on several occasions since the separation exercised extremely poor judgment with regard to the Children. Most notably were the two instances when Husband left the Children alone in a vehicle at night in a public parking lot. We shudder to think what type of harm might have come to these very young children in those circumstances if the wrong person had happened upon them. As already discussed, the record reveals numerous other instances where Husband put his own desires above the wants and needs of the Children. We need not discuss them all once again, but instead will list only a few as examples. The evidence shows that Husband failed to stay to lunch with his daughter after doing VIP duty in her classroom choosing instead to go flying, which upset his daughter. The evidence also shows that Husband missed his daughter's drama performance choosing instead to go out of town with his girlfriend. Additionally, the record reveals that while Husband had the ability to change his work schedule and did so to accommodate his Rotary meetings and at least one date with his girlfriend, he never altered his work schedule to accommodate the Children or to spend extra time with them.

The record on appeal clearly shows that the Trial Court considered all of the relevant evidence in light of the applicable statutory factors when reaching its decision regarding parenting. The evidence does not preponderate against the Trial Court's findings relative to this issue, and we find no reversible error in the Trial Court's adopting the parenting plan filed by Wife on October 3, 2009, with the deletion, by the Trial Court, of specified language.

Finally, we consider whether the Trial Court erred in determining the amount of attorney's fees and expenses awarded to Wife as alimony in solido. To begin, we note that Husband does not contend that Wife should not have been awarded attorney's fees. Rather, Husband contends that the amount awarded should have been $75,000, not $150,000. Wife argues that the Trial Court erred by not awarding her the entire amount of her requested attorney's fees and expenses.

Our Supreme Court has instructed:

It is well-settled that an award of attorney's fees in a divorce case constitutes alimony in solido. See Tenn. Code Ann. § 36-5-121 (h)(1) ("alimony in solido may include attorney fees, where appropriate"); *Herrera v. Herrera*, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996). The decision whether to award attorney's fees is within the sound discretion of the trial court. *Crabtree [v. Crabtree]*, 16 S.W.3d [356,] 361 [(Tenn. 2000)]; *Kincaid v. Kincaid*, 912 S.W.2d 140, 144 (Tenn. Ct. App. 1995).

*Gonsewski v. Gonsewski*, 350 S.W.3d 99, 113 (Tenn. 2011). Our Supreme Court also has given guidance with regard to discretionary decisions stating:

The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal. *Beard v. Bd. of Prof'l Responsibility*, 288 S.W.3d 838, 860 (Tenn. 2009); *State ex rel. Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000). It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999). Thus, it does not permit reviewing courts to second-guess the court below, *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999), or to substitute their discretion for the lower court's, *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003); *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002).

Discretionary decisions must take the applicable law and the relevant facts into account. *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008); *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996). An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors

customarily used to guide the particular discretionary decision. *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007). A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence. *State v. Ostein*, 293 S.W.3d 519, 526 (Tenn. 2009); *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d at 358; *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d at 42.

To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a lower court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions. *Flautt & Mann v. Council of Memphis*, 285 S.W.3d 856, 872-73 (Tenn. Ct. App. 2008) (quoting *BIF, a Div. of Gen. Signal Controls, Inc. v. Service Constr. Co.*, No. 87-136-II, 1988 WL 72409, at *3 (Tenn. Ct. App. July 13, 1988) (No Tenn. R. App. P. 11 application filed)). When called upon to review a lower court's discretionary decision, the reviewing court should review the underlying factual findings using the preponderance of the evidence standard contained in Tenn. R. App. P. 13(d) and should review the lower court's legal determinations de novo without any presumption of correctness. *Johnson v. Nissan N. Am., Inc.*, 146 S.W.3d 600, 604 (Tenn. Ct. App. 2004); *Boyd v. Comdata Network, Inc.*, 88 S.W.3d at 212.

*Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524-25 (Tenn. 2010).

Husband does not contend on appeal that it was inappropriate to award Wife some attorney's fees. He does not argue that Wife failed to prove a need or that he does not have the ability to pay. Nor does Husband contend that Wife failed to prove that the fees charged were reasonable. Rather, Husband contends that the attorney's fees requested by Wife were excessive because they included charges for four attorneys and Wife's valuation expert. Husband further contends, in essence, that the "matters before the Court were not novel, complicated or complex."

Wife's attorney filed an affidavit stating that Wife had incurred attorney's fees and costs of $276,787.90. The Trial Court held a hearing and then entered its order on October 29, 2010 *nunc pro tunc* to October 14, 2010, *inter alia*, awarding Wife $150,000 in

attorney's fees as alimony in solido, an amount significantly less than the amount requested by Wife.

The factual basis for the Trial Court's award of attorney's fees is properly supported by evidence in the record, the Trial Court properly identified and applied the most appropriate legal principles, and the Trial Court's decision was within the range of acceptable alternative dispositions. At a minimum, reasonable minds could disagree as to the propriety of the Trial Court's decision, the very essence of a discretionary decision. We find no abuse of discretion in the Trial Court's award to Wife of a portion, but not all, of her attorney's fees and expenses as alimony in solido.

## **Conclusion**

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed one-half against the appellant, Jeffrey Jennings Eberting, and his surety; and one-half against the appellee, Alyson Leigh Amonette Eberting.

_____
D. MICHAEL SWINEY, JUDGE